795 S.E.2d 530

**HERBERT J. THOMAS MEMORIAL HOSPITAL ASSOCIATION, Defendant Below, Petitioner**

v.

**Susan NUTTER, Plaintiff Below, Respondent**

**No. 15-0695**

Supreme Court of Appeals of West Virginia.

Submitted: September 14, 2016

Filed: November 17, 2016

Bryan R. Cokeley, Esq., Katherine M. Mullins, Esq., Steptoe & Johnson PLLC, Charleston, West Virginia, Counsel for the Petitioner.

Kelly Elswick-Hall, Esq., Marvin W. Masters, Esq., The Masters Law Firm LC, Charleston, West Virginia, Counsel for the Respondent.

Chief Justice Ketchum:

In this appeal from the Circuit Court of Kanawha County, we are asked to examine a jury's verdict that found a hospital wrongfully discharged a nurse in a manner designed to undermine public policy. As a result of that wrongful discharge finding, the jury also concluded that the hospital had intentionally inflicted emotional distress on the nurse and had defamed her. Finally, the jury found that the hospital failed to pay the nurse her full wages. The hospital contends on appeal that there is insufficient evidence to support the verdict.

After reviewing the eight-day trial transcript, we reverse the $1,004,900 jury verdict against the hospital. We find no evidence to support the jury's conclusion that the hospital wrongfully discharged the nurse in order

to jeopardize or undermine a specific public policy. We also find insufficient evidence to say the discharge was intended to inflict emotional distress upon the nurse. Further, we find that the nurse's claim for defamation was barred by a one-year statute of limitation. As set forth below, we hold that the circuit court should have granted judgment as a matter of law to the hospital on these three allegations.

As for the final issue, whether the nurse is due unpaid wages from the hospital, we find that the circuit court's conduct and rulings during the trial (including the way it asked over 300 questions of the witnesses) undermined the reliability of the jury's verdict. We therefore reverse the jury's verdict on unpaid wages and remand the case for a new trial on that single issue.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Susan Nutter is a registered nurse. In August 2008, she was hired by the defendant hospital, Herbert J. Thomas Memorial Hospital Association ("Thomas Memorial"). This case arises from the plaintiff's firing in November 2009.

The plaintiff was hired to work as a "charge nurse" in the geriatric psychiatric unit, also called the "Med-Psych Unit." A charge nurse is paid a "charge nurse differential," a premium in addition to the base salary for a registered nurse. The Med-Psych Unit serves elderly patients who have medical issues too serious for a nursing home and psychiatric issues too serious for the general population of the hospital. The unit is a locked area with capacity for up to ten patients in five rooms. Typically, the unit is staffed during the day with one registered nurse, one licensed practical nurse, and a mental health technician. Social workers and therapists rotate through as they provide services.

In February 2009, Thomas Memorial placed the plaintiff on an improvement plan, due to her being "unable to complete tasks in a timely manner; orders not signed off timely; nursing documentation incomplete;

[and] lack of daily progress notes." The plaintiff's nurse manager wrote that the plaintiff needed to improve her completion of written "orders and charting." The nurse manager later testified that the plaintiff had "time management issues," and that her handling of patient files "was a constant shuffling of paperwork" and "disorganization," "[j]ust not having a handle on this belongs here, this needs to go there," and "just constant movement of things from place to place."

In April 2009, the plaintiff visited Thomas Memorial's human resources department to ask for a transfer to another unit. The plaintiff said the nurse on the shift following hers was rude when the plaintiff was "trying to get charting done at the end of the shift." The plaintiff admitted to the human resources department that she thought her nurse manager was "doing an excellent job," and that her nurse manager placed her on an improvement plan "to try and get her charting up to par." The human resources department told the plaintiff she was not eligible to transfer while she was on an improvement plan. Thereafter, the plaintiff never returned to the human resources department, and never again sought to transfer to another unit.

The plaintiff successfully completed her improvement plan in May 2009, and in August 2009, met with her nurse manager for an annual performance evaluation. In that meeting, the plaintiff wrote that she had "good communication with manager."

### A. November 12, 2009

The Med-Psych Unit used two, one-page forms to record information.

The first form was the "Patient Education Record." This one-page form was completed for each patient, every day, and was used to chart educational interactions between the patient and hospital staff. The educational activities included "current events," "recreational therapy," and "medication management." The completed form became part of the patient's official medical record. Thomas Memorial asserts the plaintiff falsely completed one part of a Patient Education Form for each of nine patients on November 12, 2009.

The second form is the "Patient Observation—Q15 Minute Flow Sheet." Again, this one-page form was completed for each patient, every day. Mental health technicians on the Med-Psych Unit were given the task of observing each patient at least once every 15 minutes and noting the patient's location and activity on the form. The technician would initial each 15-minute block. The completed form became part of the patient's official medical record.

On the day shift of November 12, 2009, at 11:45 a.m., a music therapist was scheduled to provide musical therapy to all nine patients in the Med-Psych Unit. The therapy took place in a group setting. However, only one patient attended the voluntary session. On that patient's Patient Education Record, under the heading "Recreational Therapy," the music therapist noted in writing that, between 11:45 and 12:25, she had a one-on-one session with the patient. As to the other eight patients on the unit, the music therapist wrote on each patient's Patient Education Record that, between 11:45 and 12:25, five patients were in bed, one was "in room, then sat in hallway," another was "not feeling well," and the last patient was "on phone, then came in at end."

Several hours later, when the music therapist reviewed the files for the patients in the Med-Psych Unit, she discovered that the plaintiff made notations on a section of the Patient Education Record for "medication management." The plaintiff's notations said she met individually with all nine patients—including the patient who attended the music therapist's session—between 12:00 and 12:45. The plaintiff's notes for each patient were identical: that the plaintiff gave each patient one-on-one medication education from 12:00 to 12:45; that each patient "attended"; that each patient "participated"; and that each patient "partially meets objective needs reinforcement." The plaintiff also signed each form.

The music therapist concluded that the plaintiff's notations on each Patient Education Record overlapped and conflicted with the music therapist's notations. The music therapist had conducted her session, and noted the location of each patient, from 11:45 until 12:25. The music therapist believed that the plaintiff had engaged in "charting fraud" by charting her activities from 12:00 until 12:45. The music therapist then informed the plaintiff's nurse manager of the charting conflict.

Later that same day, the nurse manager spoke with the music therapist and other staff members in the Med-Psych Unit. The nurse manager also spoke to several patients. She did not speak to the plaintiff because, by that time, the plaintiff's shift had ended and she had left the hospital. In addition, the nurse manager reviewed patient files. The nurse manager learned that the "Patient Observation—Q15 Minute Flow Sheets," completed by a mental health technician, were consistent with the music therapist's notes and inconsistent with the plaintiff's. For instance, the mental health technician recorded that two patients were asleep for the entire time that the plaintiff allegedly conducted her medication education sessions. Based on this information, the nurse manager concluded that the plaintiff had falsely documented care "to complete the paperwork to say the job had been done."

The nurse manager took her findings to the chief nursing officer for Thomas Memorial. The chief nursing officer agreed that the evidence indicated that the plaintiff had falsified the Patient Education Records, and stated that falsifying patient files was a terminable offense. The nurse manager also took her findings to the human resources manager for Thomas Memorial. The human resources manager agreed that, absent a compelling explanation, termination was the appropriate sanction.

### B. Plaintiff's Termination

On November 16, 2009, the plaintiff was summoned to a meeting in the human resources office with the plaintiff's nurse manager, the human resources manager, and the acting director of the behavioral health department. The human resources manager testified that she conducted the meeting as an investigation into whether the plaintiff had committed a terminable offense, and sought to determine whether the plaintiff could explain away or contradict the pre-meeting evidence.

At the meeting, the three managers discussed the November 12th medical documentation with the plaintiff. The plaintiff could not explain the time overlap or the conflicting documentation. At the end of the meeting, the representatives of Thomas Memorial concluded the plaintiff had "documented care she did not give." The human resources manager therefore informed the plaintiff that her employment was terminated.

The chief nursing officer for Thomas Memorial, herself a registered nurse, knew that if a registered nurse "falsified patient records [or] intentionally charted incorrectly" it was "professional misconduct subject to disciplinary action" that, by law, had to be reported the West Virginia Board of Examiners for Registered Professional Nurses ("the Board").[1] Accordingly, on November 17, 2009, the chief nursing officer wrote a one-page letter to the Board stating that the plaintiff's employment had been terminated because "chart reviews ... indicated [the plaintiff] had falsely documented educational sessions with patients." The chief nursing officer did not advocate that the Board take any particular action, and did not include any documents with the letter.

The Board of Nursing later served a subpoena on Thomas Memorial seeking documents from the plaintiff's employment file. A Board investigator noted the plaintiff's "numerous disciplinary actions related to documentation errors" and concluded that the plaintiff should have additional education "related to legalities of documentation[.]" The Board then sent a letter to the plaintiff advising her that no action would be taken against her license. Nevertheless, the Board "caution[ed the plaintiff] to review [her] current practice for measures of improvement related to documentation."

### C. Proceedings Below

On August 11, 2011, the plaintiff filed a *three count* complaint against defendant Thomas Memorial. Count I alleged that the plaintiff's firing by Thomas Memorial was a "retaliatory discharge," a cause of action that arises "where the employer's motivation for the discharge is to contravene some substantial public policy principle[.]"[2] Count II alleged that the hospital engaged in the intentional infliction of emotional distress, in part by "filing a false complaint" with the Nursing Board. Finally, Count III alleged that the hospital violated the West Virginia Wage Payment and Collection Act.[3] Specifically, the plaintiff alleged she was hired by Thomas Memorial to work as a "charge nurse" but the hospital failed to pay her the promised "charge nurse differential."

An eight-day jury trial on the plaintiff's complaint began on April 1, 2014. At the conclusion of the plaintiff's case in chief, and again at the close of all the evidence, the hospital moved for judgment as a matter of law. The circuit court denied the motions. The circuit court then instructed the jury on *four causes of action* against Thomas Memorial. In addition to the three causes of action asserted in the plaintiff's complaint, the circuit court instructed the jury it could consider whether the plaintiff had been defamed by Thomas Memorial's letter to the Board of Nursing.

The jury was presented with four special interrogatories. The jurors voted "yes" to all four and said that the plaintiff had proved, by a preponderance of the evidence, that Thomas Memorial had "wrongfully discharged the plaintiff;" had "committed intentional infliction of emotional distress upon the plaintiff;" had "defamed the plaintiff;" and had "failed to pay [the plaintiff] any proper charge nurse wages due to her[.]" The jury awarded the plaintiff $998,000.00 for past and future lost wages, emotional distress, and for damages to her reputation. Additionally, the jury awarded the plaintiff $6,900.00 as "wages not paid" for the charge nurse differential.

The circuit court entered judgment on the verdict, and defendant Thomas Memorial

---

1. 19 C.S.R. § 3.14.1.u [2007]. *See also* 19 C.S.R. § 3.14.1.aa [2007] (It is "professional misconduct subject to disciplinary action" if a licensed nurse "failed to report to the board within thirty (30) days, knowledge of a violation by a registered professional nurse of ... this rule[.]")

2. Syllabus, in part, *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

3. *See* W.Va. Code §§ 21–5–1 to -18.

timely filed a post-trial motion asking for judgment as a matter of law under Rule 50(b) of the West Virginia Rules of Civil Procedure. In the alternative, the hospital also asked for a new trial under Rule 59(e). In an order dated June 23, 2015, the circuit court denied the defendant's post-trial motions.

Thomas Memorial now appeals the circuit court's order.

## II.

### STANDARD OF REVIEW

■■■ "Rule 50(b) of the West Virginia Rules of Civil Procedure allows a defendant to move for a judgment [as a matter of law] if, with respect to an issue essential to a plaintiff's case, there exists no legally sufficient evidentiary basis for the jury to find in favor of the plaintiff." [4] "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." [5]

When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party. [6] We use the following guideline to weigh whether there is sufficient evidence to support the jury's verdict:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved. [7]

## III.

### ANALYSIS

Thomas Memorial's overall contention is that, as a matter of law, the plaintiff failed to produce sufficient evidence to support the jury's four-part verdict. First, Thomas Memorial argues the plaintiff failed to prove the elements of a cause of action for wrongful discharge. Second, Thomas Memorial argues the plaintiff failed to prove the elements for intentional infliction of emotional distress. Thomas Memorial asserts neither of these claims should have been allowed to go to the jury.

Third, Thomas Memorial argues that a cause of action for defamation has a one-year statute of limitation, and the plaintiff filed her lawsuit more than one year after learning of the alleged defamatory acts. Whether defamation was proven at trial or not, Thomas Memorial asserts the circuit court failed to recognize that this cause of action was barred by the statute of limitation and never should have been decided by the jury.

Lastly, Thomas Memorial appears to concede it did not pay the plaintiff her charge nurse differential. However, Thomas Memorial argues it was the plaintiff's obligation to specially "code" her time when she clocked in so as to receive the charge nurse differential. Since the plaintiff did not code in her time as a charge nurse, Thomas Memorial contends it had no duty to pay her wages for that work.

---

4. *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 481, 457 S.E.2d 152, 158 (1995).

5. Syllabus Point 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009).

6. Syllabus Point 2, *id.*

7. Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

In the alternative, Thomas Memorial asserts the circuit court abused its discretion in refusing to grant a new trial. It argues that the jury's verdict was clouded by a host of evidentiary errors by the circuit court. More significantly, Thomas Memorial contends that the circuit court's conduct (such as asking over 300 questions, and taking the defense attorney's notes) altered the trial's outcome and made the jury's verdict inherently unreliable.

As we discuss below, we reverse and find that the circuit court erred in allowing the claims for wrongful discharge, intentional infliction of emotional distress, and defamation to be decided by the jury. Additionally, because of the circuit court's interjections and actions at trial, we reverse the award of damages to the plaintiff on her wage payment claim and remand that claim alone for a new trial.

## A. Wrongful Discharge

■ Thomas Memorial's first assignment of error is that the circuit court erred in refusing to grant its motion for judgment as a matter of law on the plaintiff's claim that she was wrongfully discharged. Thomas Memorial asserts that there was no evidence supporting the plaintiff's allegation that the hospital violated the federal regulations quoted by the judge as public policy.[8] Thomas Memorial contends that the mere recitation of a rule or a regulation by a plaintiff is insufficient; instead, the plaintiff must show that the discharge, in some way, jeopardized

or violated the public policy that the rule or regulation mandates.

At trial, the plaintiff asserted she was wrongfully discharged by Thomas Memorial in order to subvert substantial public policy. The plaintiff testified that she complained about numerous issues in the Med-Psych Unit during her employment, including (1) that the hospital might be committing Medicare fraud in its billing practices; (2) that the hospital was not caring for patients because there were no defibrillators in the Unit, some patients did not wear skid-proof socks, and only one shower was available for patients; (3) that patients were being discharged to nursing homes with orders for only thirty days of medication; (4) and nurses were improperly calling in prescriptions to pharmacies. The plaintiff also thought there should be additional staffing. The circuit court instructed the jury on six federal regulations as sources of substantial public policy.

■ The general rule is that an employer may discharge an "at will" employee at any time and for any reason.[9] This rule is tempered by various exceptions, one of which is that an employee may not be discharged to subvert public policy.

The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the em-

8. Thomas Memorial repeatedly asserts in its appeal briefs that the only record of the plaintiff's complaints is the plaintiff's testimony alone. The hospital argues that, while the plaintiff said she had good communication with her nurse manager during her employment, neither the nurse manager nor any of her other supervisors or fellow employees recalled the plaintiff lodging any of the complaints she made in her lawsuit. The hospital also points out that the plaintiff offered no contemporaneous writings about her complaints, and there is no written record of any complaint being made either to hospital personnel or any government agency.

Unfortunately for the hospital, an employee's testimony about on-the-job complaints is usually sufficient to create a question of material fact in a wrongful discharge case. The absence of additional evidence affects the weight or credibility of the plaintiff's evidence, not its sufficiency. In the instant appeal, we presume the plaintiff made the

complaints as she testified. "[T]he credibility of the witnesses will not be considered, conflicts in testimony will not be resolved, and the weight of the evidence will not be evaluated." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995). We reject the hospital's *sub silentio* suggestion that we reassess the evidence.

9. *Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 529, 541 S.E.2d 616, 619 (2000) ("At common law, an at-will employee serves at the will and pleasure of his or her employer and can be discharged at any time, with or without cause."); Syllabus Point 2, *Wright v. Standard Ultramarine & Color Co.*, 141 W.Va. 368, 368, 90 S.E.2d 459, 461 (1955) ("When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract.").

ployer may be liable to the employee for damages occasioned by this discharge.[10]

■■■ "[A] cause of action for wrongful discharge exists when an aggrieved employee can demonstrate that his/her employer acted contrary to substantial public policy in effectuating the termination."[11] "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."[12] "A determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury."[13]

■■■ Justice Davis, in the seminal case *Feliciano v. 7-Eleven, Inc.*,[14] discussed four factors courts should weigh to determine "whether an employee has successfully presented a claim of relief for wrongful discharge in contravention of substantial public policy[.]"[15] The test proposed by Justice Davis requires the plaintiff to plead and prove the following elements:

1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plain-tiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).[16]

Under this test, a plaintiff cannot simply cite a source of public policy and then make a bald allegation that the policy might somehow have been violated. There must be some elaboration upon the employer's act jeopardizing public policy and its nexus to the plaintiff's discharge. "The mere citation of a statutory provision is not sufficient to state a cause of action for retaliatory discharge without a showing that the discharge violated the public policy that the cited provision clearly mandates."[17]

We presume that the circuit court correctly stated public policies in the six federal regulations that it recited to the jury.[18] Our focus is upon the second element of *Feliciano*, that is, whether the plaintiff's discharge undermined the stated public policies. Our goal with this element is to ensure that an employer's personnel management decisions will not be challenged unless a public policy has, in fact, been jeopardized.

The trial record is scattered with questions and statements that suggest Thomas Memorial's actions *might* have involved Medicare

**10.** Syllabus, *Harless*, 162 W.Va. at 116, 246 S.E.2d at 270.

**11.** *Feliciano v. 7-Eleven, Inc.*, 210 W.Va. 740, 745, 559 S.E.2d 713, 718 (2001).

**12.** Syllabus Point 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992).

**13.** Syllabus Point 1, *Cordle v. Gen. Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984).

**14.** 210 W.Va. 740, 559 S.E.2d 713 (2001).

**15.** 210 W.Va. at 750, 559 S.E.2d at 723.

**16.** Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989). *See also Collins v. Rizkana*, 73 Ohio St.3d 65, 69–70, 652 N.E.2d 653, 657–58 (1995) (adopting

four factor test to determine if a plaintiff has a viable cause of action in tort for wrongful discharge); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) ("Having alleged a violation of public policy, to succeed in his wrongful-discharge claim Lloyd must thus prove: (1) The existence of a clearly defined public policy that protects an activity. (2) This policy would be undermined by a discharge from employment. (3) The challenged discharge was the result of participating in the protected activity. (4) There was lack of other justification for the termination.").

**17.** *Swears v. R.M. Roach & Sons, Inc.*, 225 W.Va. 699, 705, 696 S.E.2d 1, 7 (2010).

**18.** In their briefs, neither party cited the actual federal regulations in effect during the plaintiff's employment. However, neither party suggests the circuit court's instructions improperly interpreted, or deviated in any way from, the actual regulations.

fraud; *might* have ignored patient care matters; *might* have improperly discharged patients to nursing homes with limited supplies of medication; or *might* have allowed nurses to call in prescriptions to pharmacies. In accordance with our standard of review,[19] we take the plaintiff's testimony that she complained about these issues as true, and we accept as correct the inference that these complaints were known to the hospital.

What we cannot find in the record is any evidence by which a jury could actually find that these *"might have"* events violated a specific policy. For instance, the plaintiff complained that Thomas Memorial wasn't providing certain therapies to every patient, every day, and that *if* the hospital billed for those services, then the hospital *might* be engaging in Medicare fraud. The problem was that the plaintiff never participated in hospital billing matters, and did not know how the hospital was reimbursed by Medicare for specific services. While the hospital introduced compelling evidence that it was reimbursed on a flat fee basis (and was paid regardless of whether a service was provided or not), that does not enter our analysis. It is axiomatic that Medicare fraud is a violation of public policy; the problem is that the plaintiff did not introduce any evidence showing Medicare fraud occurred.

Likewise, the plaintiff complained that there was no defibrillator in the Med-Psych Unit, that patients were not always wearing no-slip socks, or that there was only one operational shower. This testimony certainly indicates the plaintiff was caring and compassionate toward her patients. However, the plaintiff offered no testimony showing the hospital's acts violated any standard of care, or any guideline, so as to support her claim that a clear public policy had been jeopardized. It is axiomatic that patients must receive good and adequate care. However, nothing in the record could be construed, as a matter of public policy, to say

that a defibrillator was required in the Med-Psych Unit (as opposed to next door in another unit), or that patients weren't allowed to wear their own socks. There was also no evidence to say that patients weren't being properly and timely bathed.

Additionally, there was no evidence to say that the manner in which the hospital discharged patients violated Medicare guidelines. The only evidence on that question was the plaintiff's suggestion that Medicare could do it in a different, and perhaps money-saving, way. There was also no evidence establishing specific instances of nurses calling in prescriptions for doctors in a manner that violated a clear public policy. Overall, we see nothing to suggest the plaintiff's termination in any way thwarted the ostensible public policies cited by the circuit court.

The plaintiff also complained that the Med-Psych Unit was understaffed. The plaintiff testified that Thomas Memorial told her at her hiring that a secretary would be available to the Unit for several hours a day to assist with paperwork. However, that did not happen. Further, in February 2008 (before the plaintiff was hired), the Centers for Medicare and Medicaid Services ("CMS") inspected the hospital and audited its records. In a written report, CMS determined that the hospital did not have adequate staffing on a *different unit*, the Med-Surg Unit.[20]

Federal regulations administered by CMS require a hospital to have "adequate numbers of licensed registered nurses" to provide patient care "as needed."[21] At trial, the plaintiff offered her lay opinion that this regulation meant there must "be a nurse available for each patient for a whole shift if necessary." The plaintiff asserts these facts establish she was discharged to undermine a substantial public policy requiring an adequate number of nurses.

**19.** Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. at 335, 315 S.E.2d at 593.

**20.** The report stated that "it was determined that the hospital failed to ensure adequate numbers of nursing personnel to provide nursing care to patients on the Third Floor Med/Surg Unit[.]"

**21.** 42 C.F.R. § 482.23(b) [2014] provides, in part, "The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed."

To support her case, the plaintiff contends that the facts of her case are identical to those found in Chief Justice Workman's opinion in *Tudor v. Charleston Area Medical Center, Inc.*[22] *Tudor* involved a nurse who was (constructively) discharged after complaining about only one nurse being assigned to a unit. The public policy at issue was a state, rather than federal, regulation which required hospitals to provide an "adequate number of licensed registered professional nurses[.]"[23] This Court upheld a jury verdict in nurse Tudor's favor on her wrongful discharge claim. The plaintiff encourages us to follow *Tudor* and do the same for her.

*Tudor*, however, contains significant facts that reveal the weakness of, and completely distinguish it from, the instant case. First, in the instant case, we have only the plaintiff's testimony that she complained about staffing problems in the Med-Psych Unit. While we accept her testimony as true, we noted in *Tudor* that evidence was adduced to actually prove inadequate staffing was both problematic and brought to the attention of the hospital:

> [The hospital's nurse manager] further testified that no other nurses ever complained about having only one nurse assigned to the shift. The [plaintiff], however, produced several nurses who testified that complaints by various nurses had been voiced over this staffing concern. The [plaintiff] further voiced her concerns to several supervisory employees including Johana McKitrick and Darlene Surbaugh, the charge nurses for the unit, Darla Brumfield, a nursing supervisor, and Mike King, CAMC's Vice President of Operations.... Finally, Dr. Kisner testified that the Appellee had verbally told her that she had reported her concerns to Janet Fairchild, the executive secretary for the West Virginia Board of Nurse Examiners.[24]

Second, and the most distinguishing feature of *Tudor*, is that the plaintiff in *Tudor* introduced evidence specifically demonstrating how the public policy was being violated and jeopardized by the hospital's actions. As Chief Justice Workman noted, hospital records, hospital guidelines and policies, and expert testimony showed the public policy was being routinely violated:

> The [plaintiff] also introduced in evidence the hospital guidelines which indicated that more than one nurse or care giver was required on any give[n] shift. Further, Rachel Byrd, CAMC's Director of Nursing, testified that between 1991 and 1993, the unit was consistently understaffed according to CAMC's own Medicus records. According to Ms. Byrd, the practice of assigning only one nurse per shift on the unit also contravened internal policies adopted by CAMC's nursing administrators which required a minimum of two care givers per shift. Finally, Dr. Deborah Kisner, Professor and Director of Nursing Education at Fairmont State College, testified that CAMC's practice of routinely assigning only one nurse to the unit was unsafe.[25]

In the instant case, there is no evidence specifically demonstrating whether and how a public policy was being broken or undermined by the hospital's actions. Assuming as true that Thomas Memorial promised the plaintiff several hours of secretarial support per day, and that the hospital failed to provide such support, we see no evidence in the record suggesting that secretarial support was required to meet the CMS requirement that a hospital provide adequate numbers of licensed registered nurses to provide nursing care to all patients. The plaintiff offered no hospital guidelines or policies to suggest the Med-Psych Unit was understaffed, no Medicare or Medicaid guidelines regarding staffing levels for a psychiatric unit, or any other recognized measures of proper staffing. The plaintiff likewise offered no testimony that the hospital's staffing practices in the Med-Psych Unit were in violation of or otherwise jeopardized the CMS regulation.

The plaintiff's only concrete evidence suggestive of inadequate staffing is the CMS inspection report from February 2008 per-

---

22. 203 W.Va. 111, 506 S.E.2d 554 (1997).

23. 203 W.Va. at 123, 506 S.E.2d at 566.

24. 203 W.Va. at 118 n.6, 506 S.E.2d at 561 n.6.

25. 203 W.Va. at 123 n.28, 506 S.E.2d at 566 n.28.

taining to a different hospital unit. Setting aside the fact that this inspection was done six months before the plaintiff's hiring, and involved a *wholly different unit* from the plaintiff's, the CMS report demonstrates the lack of evidence in the plaintiff's case. The CMS report details (with emphasis added) that Thomas Memorial failed to "ensure adequate numbers of nursing personnel ... on the Third Floor Med/Surg Unit" because the unit was "understaffed *(based on hospital staffing plan*[).]" The plaintiff failed to prove how the Med-Psych Unit was understaffed based upon the hospital's staffing plan, or understaffed according any other guideline or policy.

We have scoured the extensive trial record to find all evidence favorable to the plaintiff, and assumed that all conflicts in the evidence and favorable inferences were resolved by the jury in favor of the plaintiff. We are simply unable to find any evidence from which a jury could conclude that Thomas Memorial contravened some substantial public policy principle. The plaintiff's mere citation of federal regulations as sources of public policy is insufficient. We have also scrutinized the parties' briefs, seeking specific links to say what evidence supports a breach of each regulation cited. We have found none.

On this record, we can find no legally sufficient evidentiary basis upon which a jury could find in favor of the plaintiff on her claim of wrongful discharge. The circuit court should have granted the defendant's hospital's motion for judgment as a matter of law on the wrongful discharge claim, and it erred when it failed to do so.

## B. Intentional Infliction of Emotional Distress

▆ Thomas Memorial's second assignment of error is that the circuit court erred in refusing to grant its motion for judgment as a matter of law on the plaintiff's claim that the hospital intentionally inflicted emotion distress upon her. Thomas Memorial asserts that no reasonable jury could have reached this conclusion.

▆ Our law permits a plaintiff to recover damages from a defendant "who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiff.[26] Such a plaintiff must prove four elements in order to recover:

In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.[27]

▆ The first thing a plaintiff must prove is that the defendant's actions towards the plaintiff were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency. It is not enough to say that "the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."[28] "The defendant's conduct 'must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'"[29]

---

**26.** Syllabus Point 6, *Harless v. First Nat. Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982).

**27.** Syllabus Point 3, *Travis v. Alcon Labs., Inc.,* 202 W.Va. 369, 504 S.E.2d 419 (1998).

**28.** *Tanner v. Rite Aid of W. Virginia, Inc.,* 194 W.Va. 643, 650–51, 461 S.E.2d 149, 156–57

(1995) (quoting *Restatement of Torts (Second)* § 46, cmt. d (1965)).

**29.** *Travis,* 202 W.Va. at 375, 504 S.E.2d at 425 (quoting *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 383 (10th Cir. 1988)).

■ The plaintiff asserts Thomas Memorial exceeded the bounds of decency when it wrongfully discharged her with the goal of undermining public policy. However, as we noted previously, we find no evidence to say that Thomas Memorial violated or undermined any specific public policy in its discharge of the plaintiff. Further, Thomas Memorial claims it discharged the plaintiff because it perceived she had intentionally and falsely completed documentation in patient files. When we read the record in a light most favorable to the plaintiff (particularly the plaintiff's testimony), and construe all inferences in the plaintiff's favor, at best the record establishes that the plaintiff completed the documentation carelessly and improperly. While Thomas Memorial's discharge of the plaintiff on the ground that she carelessly, improperly, or incorrectly documented her actions may not have been warranted, and might have been a grievous mistake, we simply cannot say that the hospital's actions in this case were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. A defendant cannot be held liable for a singular act that is merely "inconsiderate and unkind." [30]

■ "In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress." [31] In this case, Thomas Memorial's actions were not so extreme and outrageous so as to support a jury verdict. The circuit court should have granted the defendant's motion for judgment as a matter of law and dismissed the plaintiff's cause of action for intentional infliction of emotional distress.

## C. Defamation

■ As we have noted, the plaintiff filed a three-count complaint. At trial, however, the circuit court permitted the plaintiff to assert a fourth cause of action, defamation, and instructed the jury on this fourth action. Thomas Memorial makes much hay of the fact that the plaintiff never amended her complaint to add a defamation count. The plaintiff counters that her complaint did imply a cause of action for defamation based upon Thomas Memorial's report of her firing to the Nursing Board, and that she proved that cause of action because the jury awarded her damages for injury to her reputation.

Regardless of whether a cause of action was expressly or implicitly contained within the plaintiff's complaint, we agree with Thomas Memorial that a defamation cause of action never should have been presented to the jury. Thomas Memorial argues, of course, that it was required to file a report with the Board because its investigation left the hospital's director of nursing with the impression the plaintiff had violated nursing ethics rules, namely that she "falsified patient records [or] intentionally charted incorrectly." The director of nursing was compelled by those same ethics rules to file the report or face ethical sanctions herself.

However, in this appeal we assume that all of the plaintiff's evidence is true, and that the plaintiff produced more evidence than she did, and that Thomas Memorial fired her on trumped-up charges to contravene public policy. Taken together, the evidence at trial shows that the plaintiff knew or should have known of the hospital's allegedly defamatory report to the Board no later than December 11, 2009, when she wrote an eight-page letter responding to the hospital's report.

■ Thomas Memorial argues now, as it argued to the circuit court, that a cause of action for defamation has a one-year statute of limitation. "Numerous torts such as libel, defamation, false arrest, false imprisonment, and malicious prosecution take the one-year statute of limitations set forth in West Virginia Code § 55–2–12(c)." [32] The plaintiff filed

---

**30.** *Tanner*, 194 W.Va. at 651, 461 S.E.2d at 157.

**31.** Syllabus Point 4, in part, *Travis*, 202 W.Va. at 371, 504 S.E.2d at 421.

**32.** *Wilt v. State Auto. Mut. Ins. Co.*, 203 W.Va. 165, 170–71, 506 S.E.2d 608, 613–14 (1998). *See also Snodgrass v. Sisson's Mobile Home Sales, Inc.*, 161 W.Va. 588, 594, 244 S.E.2d 321, 325 (1978) ("[P]ersonal tort actions such

her action on August 11, 2011, more than one year after learning of her potential defamation action.

By any reading of this record, the plaintiff's cause of action for defamation was barred by the one-year statute of limitation contained in W.Va. Code § 55–2–12(c).[33] Thomas Memorial was plainly entitled to judgment as a matter of law on this cause of action, and the circuit court erred in ruling otherwise.

## D. Unpaid Wage Claim

Thomas Memorial's fourth assignment of error concerns the jury's award to the plaintiff of $6,900 for unpaid wages.

■■■ The plaintiff alleged she was hired to work as a charge nurse, and that Thomas Memorial promised to pay her a charge nurse differential, a premium above the base pay for a registered nurse. The plaintiff testified that, when she clocked in, her badge would not work properly and she was prohibited from entering the code specifying she was working as a charge nurse. Thomas Memorial asserts that it was the plaintiff's obligation, whenever she clocked in, to make sure she designated herself as a charge nurse. If she failed to properly note her status as a charge nurse, Thomas Memorial contends it was fair to not pay her the charge nurse differential.

On the record presented to the jury, we find sufficient evidence upon which a jury could rule in favor of the plaintiff. On this fourth count, we find no error in the circuit

court's decision to deny Thomas Memorial's motion for judgment as a matter of law.

■■■ Unfortunately, we do not have confidence in the jury's verdict and are greatly troubled by the circuit court's conduct during the trial below. Because of the circuit court's evidentiary rulings, and because the circuit court asked over 300 questions of the witnesses, Thomas Memorial moved the circuit court for a new trial. The circuit court denied this motion. As to new trials, permitted under Rule 59 of the West Virginia Rules of Civil Procedure, our general standard of review is to ask whether the ruling of the circuit court constituted an abuse of discretion.

We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.[34]

■■■ We have said that, if a "verdict is against the clear weight of the evidence, is based on false evidence *or will result in a miscarriage of justice*, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial." [35] A party is entitled to a new trial "if there is a reasonable probability that the jury's verdict was affected or influenced by trial error." [36] "The cumulative error doctrine may be applied in a civil case when it is apparent that justice requires a reversal of a judgment because the presence of several

as defamation, false arrest and imprisonment, and malicious prosecution ... lacking statutory survivability and possessing no common law survivability, take a one-year statute of limitations under W.Va.Code, 55–2–12(c)."); *Rodgers v. Corp. of Harpers Ferry*, 179 W.Va. 637, 640–41, 371 S.E.2d 358, 361–62 (1988) ("The one-year statute of limitations in W.Va. Code § 55–2–12(c) applies to civil actions which do not survive the death of a party. Consequently, personal tort actions such as libel, defamation, intentional infliction of emotional distress, false arrest, false imprisonment, and malicious prosecution take the one-year statute of limitations[.]").

33. W.Va. Code § 55–2–12(c) [1923] provides, in part:

Every personal action for which no limitation is otherwise prescribed shall be brought: ... (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

34. *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995).

35. Syllabus Point 3, in part, *In re State Public Building Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994) (emphasis added).

36. *Tennant*, 194 W.Va. at 111, 459 S.E.2d at 388.

seemingly inconsequential errors has made any resulting judgment inherently unreliable." [37]

 Thomas Memorial's brief relates a host of actions by the circuit court which, when judged as a whole, supports its argument that the jury's verdict is inherently unreliable. For instance, Thomas Memorial contends the circuit court violated the duty of impartiality in its questioning of the witnesses. "The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties." [38] Our law is clear that the "paramount function of the trial judge is to conduct trials fairly and to maintain an atmosphere of impartiality." [39] In asking questions, the judge must "sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury." [40]

In the instant case, the circuit court propounded over 300 questions to witnesses. Counsel for Thomas Memorial objected to the form of many of these questions and asked for a mistrial, objections that were dismissed by the circuit court. We have reviewed the circuit court's questions and find that many implicitly suggested Thomas Memorial's charting requirements were burdensome for employees. The circuit court's questions suggest a jaundiced view of Thomas Memorial's witnesses, while the questions for the plaintiff were friendly, courteous, and favorable to the plaintiff.

Moreover, when counsel for the hospital objected to the circuit court's questioning, the circuit court expressed anger. On one occasion, the circuit court accused defense counsel of "padding the record" and told counsel to discuss his objections "in a humanly way" off the record. On the sixth day of trial, counsel for the hospital made a motion for a mistrial based upon the circuit judge's conduct. The circuit court interrupted counsel, asking, "Are you reading something there?" When counsel said he was referring to his trial notes, his own work product, the circuit court told him to put his notes in the record. Counsel filed his notes under seal.

 We have also examined various evidentiary rulings by the circuit court throughout the trial. Specifically, Thomas Memorial offered, at various points throughout the trial, evidence to establish the state of mind of several hospital employees. "Evidence demonstrating the employer's state of mind is 'of crucial importance in wrongful discharge cases.'" [41] Various documents were offered by Thomas Memorial to establish how hospital managers acted toward the plaintiff, and to show what evidence led them to terminate the plaintiff.

 The plaintiff objected, asserting that the statements contained within the documents were hearsay. Thomas Memorial rightly countered that any statements contained within the documents were not hearsay because they were not offered for the truth of the matters asserted, but rather were "offered for the mere purpose of explaining previous conduct." [42] "Words offered

---

**37.** Syllabus Point 8, *Tennant*, 194 W.Va. at 102, 459 S.E.2d at 379.

**38.** Syllabus Point 3, *State v. Farmer*, 200 W.Va. 507, 490 S.E.2d 326 (1997).

**39.** *McDonald v. Beneficial Standard Life Ins. Co.*, 160 W.Va. 396, 398, 235 S.E.2d 367, 368 (1977).

**40.** *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (quoting *Frantz v. United States*, 62 F.2d 737, 739 (6th Cir. 1933)). *See also State v. Thompson*, 220 W.Va. 398, 400, 647 S.E.2d 834, 836 (2007) (holding judges in criminal cases must exercise restraint and impartiality in questioning witnesses).

**41.** *Garner v. Missouri Dep't of Mental Health*, 439 F.3d 958, 960 (8th Cir. 2006) (quoting *Hardie v.*

*Cotter & Co.*, 849 F.2d 1097, 1101 (8th Cir. 1988)).

**42.** Syllabus Point 1, *State v. Paun*, 109 W.Va. 606, 155 S.E. 656 (1930). *See also* Syllabus Point 1, in part, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990) ("Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: ... the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, *state-of-mind*, identification or reasonableness of the party's action[.]") (emphasis added); *State v. Morris*, 227 W.Va. 76, 80–81, 705 S.E.2d 583, 587–88 (2010) ("This Court has held that testimony by police officers involving matters they learned from other per-

to prove the effect on the hearer are admissible when they are offered to show their effect on one whose conduct is at issue."[43] Because the documents showed the evidence and statements weighed by the hospital's managers who eventually discharged the plaintiff, and went to the managers' states of mind, they should have been admissible.

Also at trial, the circuit court permitted counsel for the plaintiff to read portions of the same documents during the examination of witnesses. However, the circuit court prohibited defense counsel from using or admitting the very same documents with the very same witnesses.

In sum, our review of the record shows numerous abuses of the circuit court's questioning of witnesses. It also shows an abuse of discretion in the admission, or refusal to admit, evidence favorable to the defense. Taking the record as a whole, we find the jury's entire verdict to be inherently unreliable. The circuit court's judgment regarding the plaintiff's wage claim must therefore be reversed, and the wage claim remanded for a new trial.

## IV.

## CONCLUSION

The circuit court erred when it refused to grant Thomas Memorial judgment as a matter of law on the plaintiff's causes of action for wrongful discharge, intentional infliction of emotional distress, and defamation. The circuit court also erred when it refused to grant the defendant hospital a new trial on the plaintiff's claim for unpaid wages.

Accordingly, the circuit court's June 23, 2015, order is reversed, and the case is remanded for further proceedings on the plaintiff's unpaid wage claims.

Reversed and remanded.

sons offered merely to explain prior conduct in carrying out the investigation is not hearsay."); *State v. Dennis*, 216 W.Va. 331, 350, 607 S.E.2d 437, 456 (2004) (Statement was not hearsay, because "the victim's out-of-court statement was not offered for the truth of the matter asserted, but rather to explain the actions taken by the officer after the statement was made to him.").

JUSTICE BENJAMIN, deeming himself disqualified, did not participate.

JUDGE JOHN A. HUTCHISON, sitting by temporary assignment.

JUSTICE DAVIS and JUSTICE WORKMAN dissent and reserve the right to file separate opinions.

JUSTICE LOUGHRY concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

WORKMAN, Justice, dissenting, joined by DAVIS, Justice.

I cannot and will not agree to join an opinion which, in effect, arrogantly assumes the position that a select group of individuals, namely appellate judges, are better able to determine the credibility of witnesses and the facts of the case than are the group of average citizens who sat as jurors and actually watched the evidence unfold at trial. Although the jury system is not perfect, it is clearly the best system in the world for deriving the truth of facts and under proper instruction of law, assessing liability. (The people of West Virginia felt that way, too, when they adopted our Constitution.[1]). Accordingly, this Court has consistently held that verdicts rendered by a jury are to remain, for the most part, undisturbed by the trial court. When a case involves conflicting testimony and it has been fairly tried, "the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." Syl. Pt. 4, in part, *Laslo v. Griffith*, 143 W.Va. 469, 102 S.E.2d 894 (1958); *see also Lodis v. Corbis Holdings, Inc.*, 192 Wash. App. 30, 366 P.3d 1246, 1249 (2015), *review denied*, 185 Wash.2d 1038, 377 P.3d 744 (2016) ("Trials matter. The results of trials matter.").

**43.** 29 Am. Jur. 2d Evidence § 676.

**1.** West Virginia Constitution article III, § 13, provides, in part: "In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved[.]"

This Court has proclaimed its esteem for the knowledge, wisdom, and judicial acumen of trial judges in matters of this kind. We have said that:

"[T]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syl. Pt. 2, *Estep v. Mike Ferrell Ford Lincoln–Mercury, Inc.*, 223 W.Va. 209, 672 S.E.2d 345 (2008). It is imperative that this Court accord trial judges *great respect* in making these rulings because they have the "unique opportunity to consider the evidence in the living courtroom context," while appellate judges are at a severe disadvantage because we can see only a "cold paper record[.]" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (citation omitted).[2]

Instead, the majority ignores decades of precedence, shows no deference whatsoever to the trial court's judgment, and presents a complete "gloss job" of the facts. What is beyond troubling, however, is the majority's blatant disregard for the jury's reasoned verdict and patent refusal to apply well-settled law in a neutral way.

Syllabus point five of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983) *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), controls the standard of review for Thomas Hospital's motion for judgment as a matter of law filed pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

In this case, that rule is cited by the majority but then, utterly disregarded by it.

The appropriate inquiry of this Court is whether there was sufficient evidence to support the jury's verdict; the answer to that question is an obvious "Yes." Thomas Hospital's treatment of Ms. Nutter was appalling. Thomas Hospital falsely accused Ms. Nutter of fraudulent charting, fired her, and then filed a false complaint with the Board of Nursing. The jury heard how Thomas Hospital's actions devastated Ms. Nutter professionally, financially, and emotionally. And the jury decided that Ms. Nutter was entitled to be compensated fairly and accurately for injuries directly attributable to Thomas Hospital's retaliatory treatment of her.

On what basis, therefore, does the majority reverse the jury's award? It concludes that Ms. Nutter's claims for retaliatory discharge and intentional infliction of emotional distress fail as a matter of law. The majority goes on to reverse the jury's verdict on unpaid wages under the Wage Payment and Collection Act and remands the case for a new trial on that single issue based on the trial judge's conduct. The majority's analysis is remarkably wrong on those claims.[3]

The majority ultimately concludes it is "simply unable to find, *any* evidence from which a jury could conclude that Thomas

---

2. *See also Read v. Shu*, 419 Pa.Super. 227, 615 A.2d 109, 110 (1992) ("An appellate court by its nature stands on a different plane than a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge.").

3. The majority finds that the cause of action for defamation was barred by a one-year statute of limitation. I do not disagree with that determination. Nevertheless, as discussed below, Thomas Hospital did not request to have the jury make special findings as to its liability on each of the issues. Therefore, Ms. Nutter is entitled to receive all the damages awarded by the jury because it could have attributed those damages to her retaliatory discharge claim. *See* Syl. Pt. 6, *Orr*, 173 W.Va. 335, 315 S.E.2d 593.

Memorial contravened some substantial public policy principle." (Emphasis added). That is a jaw-dropping statement considering the 3,647 page appendix record. This outlandish declaration springs from a diseased root: an exalted impression of the role of the members of this Court; it is an assertion of appellate supremacy over the fact-finding function of the jury. The majority envisions this Court as enthroned and empowered to decide questions of fact and credibility whenever it believes the jurors got a case wrong. This image of the Court would have been unrecognizable to those who ratified our Constitution.

To arrive at the result *it* fancies, the majority has disregarded the applicable case law, resolved disputed facts in favor of Thomas Hospital, invaded the trial court's discretion, and treated the considered judgment of the jurors in a cavalier manner. However, the jury was far closer to the presentation of the facts than this Court could ever be through appellate review. It is not the prerogative of this Court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function. As discussed more fully below, the jury reached its conclusion within the parameters of the evidence presented. Furthermore, the trial court's behavior, while not flawless, did not warrant reversal of a jury verdict.

### Evidence Established Retaliatory Discharge

When we review the evidence in the light most favorable to Ms. Nutter, it is clear that she presented sufficient evidence of retaliatory discharge to support the jury's verdict. This case is patently similar to *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), wherein we found there was ample evidence from which the jury could find that the hospital acted with a "bad motive" in discharging a nurse because she complained about inadequate staffing and such discharge violated a substantial public policy set forth in regulations regarding registered nurse ("RN") staffing.

In this case, there can be no reasonable disagreement that the Med–Psych unit was chronically understaffed. Upon hire, Thomas Hospital told Ms. Nutter that there would be an RN, a licensed practical nurse ("LPN"), two mental health technicians ("MHTs"), and a unit clerk assigned to work the Med–Psych unit during her shift. The unit did not operate with this full complement of staff, however. In reality, one RN, one LPN, and one MHT worked on the Med–Psych unit each midnight shift. Beverly Carnifax, an MHT on the Med–Psych unit, corroborated Ms. Nutter's testimony that there were supposed to be two MHTs on the unit. However, throughout 2008 and 2009, Ms. Carnifax was the only MHT assigned to the unit. Ms. Carnifax admitted that "[w]e always complained about not having enough help. We complained among ourselves and just did the work."

With only one MHT and no unit clerk to assist her, Ms. Nutter had difficulty attending to the patients and completing her charting during the shift because her "main concern was the patient and the safety of the patients." Ms. Nutter voiced concerns with her supervisor, Christina Edens, RN, that three full-time employees on that unit were not enough to provide appropriate care to these patients because of the "acuity of the patients," their "cognitive levels, and the fact that they [had] … uncontrolled behaviors and were a danger to themselves and others[.]" [4]

Thomas Hospital was cited by the Centers for Medicare and Medicaid Services ("CMS") in February of 2008 for deficiencies in staffing. CMS found that the standard set forth in 42 Code of Federal Regulations § 482.23(b) (2008) [5] regarding staffing and delivery of

---

**4.** During her tenure at Thomas Hospital, Ms. Nutter raised several other patient safety concerns issues with her supervisor.

**5.** 42 Code of Federal Regulations § 482.23 provides:
 b) Standard: Staffing and delivery of care. The nursing service must have adequate numbers of

licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient.

care was not met based on a review of the third floor staffing plan, staff schedules, staff assignments and patient census. The CMS found this deficiency had "the potential to adversely effect [sic] the care of all patients on the Third Floor Med/Surg Unit;" the unit adjacent to the Med–Psych unit. When asked if there were enough staff on the Med–Psych unit to meet this CMS requirement, Ms. Nutter answered "No" and explained:

> Well, if we had patients who were suicidal, we had to watch them. You know, so that they didn't get in their rooms and maybe if they had gotten hold of something that [they] could harm themselves with, slit their wrists or hang themselves. So we had to really keep them under observation every five minutes.

> Also, [there] were patients ... [with] severe dementia, and ... impulse control problems ... they would be fine one minute, they could be beside another patient maybe in their rooms, if one patient maybe touched or took another patient's object, they would break out in a fist fight and hurt each other. Those types of things went on 24 hours a day.

Ms. Nutter testified that she cared for challenging patients at the Med–Psych unit and patient care was her first priority. This ten-bed unit served elderly patients who had medical issues too serious for a nursing home and patients with psychiatric issues too serious for the general population of the hospital. Ms. Nutter testified that

> out of ten patients there were many days that I would have 7 to 8 patients that could not lift a spoon to their mouth. You know, they couldn't bathe themselves. You had to assist with showers. You had to feed them. You had to make sure that—they were high fall risk. You know, [the patients were] 60, 70, 80, 90 years old, [and nurses had to make] ... sure when they were ambulating, they didn't fall and hurt themselves.

Had a second MHT and unit clerk been assigned to her shift to assist Ms. Nutter with patient needs, charting, and paper work, she could have spent the time needed to provide appropriate nursing care. Ms. Nutter would stay over her shift to complete charting but management discouraged this practice because it led to overtime. However, Ms. Nutter told the jury that overtime "was severely frowned upon. And Christina [Edens, her supervisor] would be upset with me." At times, Ms. Nutter would clock out and stay to complete her paperwork. In February of 2009, Thomas Hospital placed Ms. Nutter on a work improvement plan that stretched into May of 2009; instead of providing sufficient staffing, Thomas Hospital told Ms. Nutter to "improve her time management skills."

The Med–Psych unit required that an RN be present at all times; because there was only one RN per shift assigned to the unit, Ms. Nutter frequently worked twelve or thirteen hour shifts with no breaks or lunch breaks. If she needed to leave the unit to take a break, Ms. Nutter would have to call other units to see if someone could come to relieve her. However, the other units were understaffed as well, so often they could not relieve her. A witness *called by Thomas Hospital* confirmed this situation; Rebecca Chandler, an RN who worked the midnight shift on the Med–Psych unit, was asked if she "never took a lunch break or other break because there wasn't anybody to relieve you?" And she answered, "[t]hat's right." These RNs worked *twelve hour shifts* with little to no opportunity to step away from the unit to take a break. No one should have to work under these intolerable conditions. More to the point, however, these acutely ill patients deserved appropriate medical staff. In fact, Thomas Hospital was required by federal regulation to provide adequate numbers of nurses "and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each ... nursing unit to ensure, when needed, *the immediate availability of a registered nurse for bedside care of any patient.*" 42 C.F.R. § 482.23 (emphasis added).

The evidence also established that Ms. Nutter was the recipient of reprisals for voicing concerns about patient safety issues including appropriate staffing. Ms. Nutter testified that she overheard Ms. Edens plotting to discharge her. Eventually, their working relationship deteriorated to the point that Ms. Edens "ostracized" Ms. Nutter "and

very nearly just quit communicating with" her. For instance, Thomas Hospital issued Ms. Nutter a written warning for leaving the unit to take a break to gain composure after caring for a patient who passed away. This incident occurred about a week after Ms. Nutter's mother, who also suffered with dementia, died. Ms. Nutter was unable to find an available RN to cover the unit, but she did make sure a physician assistant remained on the unit when she took this short break. The jury also heard that Thomas Hospital retaliated against Ms. Nutter financially and failed to pay her the enhanced charge nurse pay even though she brought that matter to the attention of Ms. Edens repeatedly.

With regard to Ms. Nutter's retaliatory discharge claim, she identified several CMS regulations as the sources of substantial public policies of West Virginia. However, one regulation is so directly on point with this Court's holding in *Tudor* that there is no need to discuss the others. The Medicare provision regarding RN staffing, 42 C.F.R. § 482.23, is nearly identical to the language of the State regulation found by this Court to constitute substantial public policy in *Tudor*:

> West Virginia Code of State Regulations § 64–12–14.2.4 (1987) sets forth a specific statement of a substantial public policy which contemplates that a hospital unit will be properly staffed to accommodate the regulation's directive; to ensure that patients are protected from inadequate staffing practices; and to assure that medical care is provided to hospital patients, especially children and young adolescents, who must depend upon others to protect their medical interests and needs.

Syl. Pt. 5, *Tudor*, 203 W.Va. at 111, 506 S.E.2d at 554. Therefore, the trial court's ruling with regard to the retaliatory discharge claim is entirely consistent with our holding in *Tudor*. In view of our prior precedent on the dispositive issue presented in this case, a memorandum decision affirming the jury verdict would have been appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

The majority does not even attempt to distinguish *Tudor* legally because clearly it recognized that would be an exercise in futility. In its paltry attempt to distinguish *Tudor* factually, the majority sifts through the evidence in both cases and essentially determines that the plaintiff in *Tudor* had a better case than Ms. Nutter because she had more documentary evidence. The majority is eager—even hungry—to tell everyone how it thinks Ms. Nutter *should* have presented her case. But the majority can reach its ultimate conclusion to overturn the jury verdict only by itself weighing the evidence in favor of Thomas Hospital. The bottom line, however, is that the three members of the majority discredit Ms. Nutter's testimony when the jury believed her; by doing so, the majority usurps the proper role of the jury and denies Ms. Nutter her constitutional right to a jury trial.

Not surprisingly, the majority's recitation of the facts leaves out important parts of the story. It finds that Ms. Nutter "could not explain the time overlap or the conflicting documentation." Actually, Ms. Nutter was given no opportunity to do so. *See* note 6 *infra*. The majority also notes that Ms. Nutter "admitted to the human resources department that she thought her nurse manager was 'doing an excellent job[.]'" Actually, the human resources manager, Marybeth Smith, was not available to meet with Ms. Nutter, and she was referred to Beth Davis who was the nurse recruiter. Ms. Nutter explained this conversation as follows:

> I said that I knew Christina [Edens] was under a tremendous amount of pressure because Joint Commission was coming for an inspection and Medicare was coming for an inspection, and even though I felt conflicted in my emotions about the things that were going on and what she was saying, and the discussion that I had overheard … I was not going to complain to Beth Davis because she was a nurse recruiter. And I did not know, understand the realm of her responsibility, and I just didn't want to get Christina [Edens] in trouble. She was under tremendous amount of pressure. This was her first management job, I was trying in every way that I knew to be supportive of her.

In spite of her unreciprocated loyalty to Ms. Edens, Ms. Nutter did report to Ms. Davis

that she was in a "hostile work environment" and asked for a transfer. The majority also fails to mention the fact that the Med–Psych unit operated with only one MHT; the majority only discusses the void left by the absence of the unit clerk.

There is evidence of record to support the jury's verdict and that alone is enough for this Court to resolve the case. RN staffing was a problem at Thomas Hospital even before Ms. Nutter was hired and the problem persisted. She complained to her supervisor about the difficulty meeting patient needs. Following these complaints, Ms. Nutter's working environment grew "hostile" and she was ultimately discharged. Based on this evidence, the jury concluded that Ms. Nutter was targeted for termination as a result of those complaints in violation of a substantial public policy of this State.

The jury heard Ms. Nutter describe the termination meeting in disturbing detail.[6] It is clear from her testimony that Thomas Hospital was determined to fire Ms. Nutter and was not interested in allowing her to explain what really happened. The jury also saw that the hospital's documents actually supported Ms. Nutter's testimony that she did nothing wrong.[7] Despite this evidence to

---

6. Ms. Nutter stated that:

> I ran into Christina Edens and Sarala Sasahendrin in the hallway. And they said, "Come join us, we're going up here to the personnel office." So I went with them and did not realize anything about why we were there.
> And we entered into Marybeth Smith's office and Christina began the discussion. And she said, "We have called you in here today because ... on chart audits, we have found where you charted a group, a group session while there was another group session going on with the recreation therapist." And they told me that it had happened on Thursday. So I had to think because so much had happened over the weekend. And my response to that was, "Christina, I did not do a group session on Thursday when I returned to work. I did individual one on one sessions with each patient." And she became argumentative and said, "Well, you could not have possibly done it the way you charted it. And therefore, we are—we feel that you have falsified patient records, patient documentation."
> And she even went to the point to raise her arm and point and in a rather loud voice said, "There was even one of those patients who had not even been gotten out of the bed for 7 days." Of course, Thursday was my first day back.
> So I was very hurt because I felt that she should be yelling at the nurses who had left that patient in the bed for 7 days.
> So, I said, "Well, I did one on one with each patient." And I turned to Marybeth [Smith, Human Resources Director] and leaned forward in my chair to try to explain to Marybeth, because I knew she did not understand how patients wandered in and out of rooms or in the hallway.
> And as I was leaning forward trying to explain how that the patients traveled on that unit and that I have to keep up with them as a nurse. I have to, you know, be where the patient is. Sarala Sasahendrin had turned her chair sort of towards Marybeth and she chimed in and said, "Well, you could not have possibly done it in the way that you have charted it because it would have taken over ten hours." And she became expressive with her arm and kind of swung her left arm back towards me, and swatted her hand at me.
> And I backed up in my chair and my eyes filled with tears. I looked at Marybeth and I said, "Well, I can see that you all have already decided what you are going to do." And at that point she presented me with a paper that had been turned over face down on her desk and she turned it up and handed it to me. And said, "We are terminating your position. We are terminating you today. We will be contacting the Nursing Board that you have falsified records."

7. On November 12, 2009, Ms. Nutter charted that from 12:00 to 12:45 she was providing medication education to the nine patients on the unit. During some of this time frame, the recreation therapist, Lara Woodrum, charted that she was showing a video from 11:45 to 12:25. Ms. Woodrum checked "group" for her services, even though she met with only one patient. Ms. Woodrum left the unit and returned later that day. When she noticed her charting overlapped somewhat with Ms. Nutter, Ms. Woodrum e-mailed management that Ms. Nutter did not give the medication counseling when she checked that she did.

However, the medical records show that, of the nine patients involved, only one of them went to see the video with Ms. Woodrum and there was not a recreational "group." The other patients were documented as being in bed or in the hall of the unit and were available to receive the medication counseling from Ms. Nutter. With regard to the remaining patient who watched the film, it ended at 12:25, giving Ms. Nutter time to provide medication counseling between 12:25 and 12:45 to that particular patient.

the contrary, Thomas Hospital's witnesses, one by one, still insisted at trial that Ms. Nutter intentionally committed fraudulent charting. Ms. Nutter's attorney annihilated their veracity on cross-examination.

When asked how the termination meeting made her feel, Ms. Nutter responded that: "I was just blown away. I was tearful. I knew that there was no arguing with it." The hospital never gave Ms. Nutter the patient records to look at to defend against these allegations. Ms. Nutter told the jury what happened after the termination meeting:

Christina Edens escorted me to the unit. I was allowed to get my belongings.

I wasn't allowed to touch another chart to finish anything. And then she escorted me back out the doors and I took the elevator to my car and sat in my car.

I was having chest pains and crying. And so I took a nitroglycerin and tried to collect myself so that I could drive home safely.

By the time the jury heard that Thomas Hospital discharged Ms. Nutter, it obviously had determined that the accusations of intentional wrongdoing and fraudulent charting lacked foundation. However, Thomas Hospital took this discharge a step further, and endeavored to ruin Ms. Nutter's career by filing a false complaint with the Nursing Board. Ultimately, the Nursing Board reviewed the information supplied by Thomas Hospital and resolved the complaint in Ms. Nutter's favor *without holding a hearing*. The Nursing Board obviously saw the complete lack of merit in Thomas Hospital's report.[8] When one sees such blatantly false claims, one cannot help but conclude that Ms. Nutter was the victim of a retaliatory discharge.

The jury also heard that Ms. Nutter was ravaged professionally, emotionally, and financially as a result of the termination and false complaint to the Nursing Board. The financial stress and worry about her career and future caused Ms. Nutter to suffer major depression and anxiety. Ms. Nutter's expert witness, psychologist Jeff Harlow, Ph.D., evaluated her and diagnosed a panic disorder, generalized anxiety disorder, an adjustment disorder and depression. Dr. Harlow opined that Ms. Nutter's psychological conditions were permanent and directly related to the termination and complaint to the Nursing Board: "it has been four years since this event, and she is still having two to three panic attacks a week and she is still having flashbacks of the termination. She is having nightmares about the termination."[9]

The charts show that Ms. Nutter was giving the medication education to the patients, "1:1," meaning one-on-one, during the period from 12:00 to 12:45. Ms. Nutter explained that she would talk to a patient about his medications, tend to whatever other needs he may have, then go to the next patient and repeat the same. She would come back around to the patients to reinforce what she told them. Ms. Nutter testified that this was the only way she knew how to give medication therapy to mentally compromised patients.

The jury was shown Patient Observation Flow Sheets, or "bed checks" that another employee on the same shift, Beverly Carnifax, MHT, with the same patients, documented that she was giving "current events" education to one patient in one room at the same time that she was giving current events training to a person in another room; Ms. Carnifax documented giving current events education to one patient, where the records show that the patient was in the shower. Yet, the jury heard that absolutely nothing was done or even mentioned to this employee. The MHT was not fired, not accused of fraud, not disciplined nor even spoken to by supervisors. These discrepancies were on the very same records that Thomas Hospital used to support their termination and accusations of fraudulent charting against Ms. Nutter.

8. By letter dated November 17, 2009, Rebecca Brannon, Vice President of Nursing with Thomas Hospital, informed the Nursing Board that the hospital had discharged Ms. Nutter for "falsely document[ing] educational sessions with patients." After reviewing this matter, the Nursing Board notified Ms. Nutter that it would take no action against her license by letter dated July 22, 2010.

9. On cross-examination, defense counsel asked Dr. Harlow about Ms. Nutter's previous hospitalization at a psychiatric facility. Dr. Harlow explained that Ms. Nutter had a history of psychological treatment following the loss of her sixteen-year-old son to suicide in 2003. He opined that some of her psychological conditions were related to the loss of her son. However, looking at her records demonstrated that "she was able to get to a point where she could cope better with" it and "move on and go on with her life" even though there was always going to be an undercurrent of grief and depression." For instance, Ms. Nutter was able to return to work as a nurse and support herself and her daughter.

Before her termination, fifty-five year old Ms. Nutter was making on average $55,000 to $59,000 a year as an RN. She intended to work as an RN until at least age sixty-seven, and "probably longer than that if [she] was physically able." However, after the discharge, Ms. Nutter was required to report the pending charges with the Nursing Board to any potential employer, which basically eliminated her chances of finding work as an RN for the eight months those charges were pending. Since her termination, Ms. Nutter has worked as a part-time home health aide, a housekeeper, and caregiver. In the year 2010, Ms. Nutter earned approximately $18,000; in the year 2011, she earned approximately $16,000. Ms. Nutter was the sole provider for her teenage daughter; the family struggled financially and plummeted into poverty.

For purposes of this Court's analysis, it is unnecessary to discuss the evidence Thomas Hospital presented to try to excuse its outrageous behavior. Such evidence was placed before the jury and it was firmly rejected; any issue therein would relate to the jury's assessment of the credibility of the witnesses. *See State v. Guthrie,* 194 W.Va. 657, 669, 461 S.E.2d 163, 175 (1995) ("Credibility determinations are for a jury and not an appellate court."). Because there was substantial evidence to support the jury's verdict, the trial court was correct to deny Thomas Hospital's motion for judgment as a matter of law.

How can the majority possibly escape this painfully obvious conclusion? Although the majority claims the mantle of precedent, it is unable to identify a single case that endorses its essential premise, namely, that a plaintiff who prevails following a jury trial must put forth documentary evidence of the "smoking gun" in a retaliatory discharge case to survive a Rule 50(b) challenge. *See* W.Va. R.Civ.P. 50(b). However, Ms. Nutter explained that she was trying her best to work through the chain of command to solve prob-

lems on the unit. Ms. Nutter admitted she kept no documentation because she was addressing her concerns with her supervisor, Ms. Edens, and "wasn't trying to get anybody in trouble on any level."

In *Page v. Columbia Natural Resources, Inc.,* 198 W.Va. 378, 480 S.E.2d 817 (1996), this Court recognized that the ultimate question of whether a plaintiff was the victim of a retaliatory discharge is not always "strikingly obvious from the record[.]" *Id.* at 388, 480 S.E.2d at 827. We astutely observed "that employers rarely discriminate openly." *Id.* Applying the appropriate standard set forth in *Orr,* in *Page,* we found sufficient proof upon which the jury could base its verdict. Moreover, we noted "that the jury had the benefit of observing the testimony and determining the credibility of the evidence presented on behalf of both parties." *Id.* The same rationale rings true in the instant case.

## Damages Related to Retaliatory Discharge Claim

As in *Tudor,* the verdict form used here allowed the jury to award both special (lost wages) and general (emotional distress and injury to reputation) damages as long as the jury found that liability existed as to any one of the four causes of action on the verdict form. *See Tudor,* 203 W.Va. at 121 n.25, 506 S.E.2d at 564 n.25.[10] Here, the jury found liability existed as to every cause of action. We previously held with regard to general verdicts that

[w]here a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by the evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues.

Syl. Pt. 6, *Orr,* 173 W.Va. at 339, 315 S.E.2d at 597.

Thomas Hospital did not request to have the jury make special findings as to its liabili-

---

**10.** In *Tudor,* the plaintiff alleged constructive retaliatory discharge, tortious interference with employment opportunities, defamation, invasion of privacy, and intentional infliction of emotional distress. The jury awarded $500,000 in damages to professional reputation, emotional distress and

mental anguish; we found those damages duplicative of the jury's $1,000,000 punitive damage award. *Id.* at 133, 506 S.E.2d at 576. In this case, however, Ms. Nutter withdrew her request for punitive damages.

ty on each of the issues. Therefore, Ms. Nutter is entitled to receive all the damages awarded by the jury because it could have attributed those damages to her retaliatory discharge claim. It is therefore wholly unnecessary to address Thomas Hospital's arguments regarding Ms. Nutter's claims of defamation and the tort of outrage.

## Trial Judge's Conduct Did Not Unfairly Prejudice Thomas Hospital

Thomas Hospital devotes half of its brief to arguing that the trial was fundamentally unfair as a result of the trial judge's questions and comments; Thomas Hospital lays blame for the jury verdict against it wholly at the trial judge's doorstep. Ms. Nutter responds that most of the questions posed by the trial judge elicited testimony that was neither hurtful nor helpful to either side, but simply filled in information for the jury. Ms. Nutter also asserts that defense counsel was disruptive and disrespectful to the court by repeatedly interrupting the trial and approaching the bench. It does appear that defense counsel attempted to bait the court, perhaps in the goal of creating a record that could aid him on appeal.

As we held in syllabus point one of *Alexander ex rel. Ramsey v. Willard*, 208 W.Va. 736, 542 S.E.2d 899 (2000): " 'The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties.' Syl. Pt. 3, *State v. Farmer*, 200 W.Va. 507, 490 S.E.2d 326 (1997)." While the trial judge has wide discretion in the conduct of trial, he or she must not make comments or insinuations, by word or conduct, indicative of an opinion on the credibility of a witness or the argument of counsel. Because of the judge's large influence over the jury, he or she must exercise a high degree of care to remain impartial, and to not display prejudice or favor toward any party.[11]

In *Alexander*, we recognized that in order to resolve an allegation of prejudicial conduct by a trial court, a reviewing court is obligated to evaluate the entire record. 208 W.Va. at 744, 542 S.E.2d at 907. In this case, some of the trial court's leading questions and remarks could be characterized as improper and/or unnecessary. Nevertheless, in view of the totality of the eight-day trial, I have no qualms whatsoever in concluding that the trial court's behavior affected the jury's verdict not at all.

It was the strength of Ms. Nutter's case that caused the jury to award her more than $1 million in damages. After reviewing this record, it is abundantly clear that Thomas Hospital was teetering on the edge of losing this case before Ms. Nutter even took the stand. Ms. Nutter's counsel called a parade of Thomas Hospital's employees in her case-in-chief and they all were thoroughly impeached as the pretense for the discharge was so repugnantly transparent. In stark contrast, Ms. Nutter took the stand on day four of the trial and offered compelling, articulate testimony that makes even this cold appellate record shock one's sense of decency and fair play. By the time Ms. Nutter stepped down from the witness stand, her case for retaliatory discharge was well-supported by the evidence. For this reason, the decision of the jury, exercising its common sense and sound honest judgment regarding the evidence it saw and heard firsthand, should not be overturned. Thomas Hospital was given every opportunity to fairly defend

---

11. Historically, a trial judge's role in the administration of justice compelled him to act as more than a simple referee between opposing counsel. "In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts." And again: "Trial by jury in the courts of the United States is a trial presided over by a judge, with authority, not only to rule upon objections to evidence and to instruct the jury upon the law, but also, when in his judgment the due administration of justice requires it, to aid the jury by explaining and commenting upon the testimony, and even giving them his opinion on questions of fact, provided only he submits those questions to their determination." *Capital Traction Co. v. Hof*, 174 U.S. 1, 16, 19 S.Ct. 580, 43 L.Ed. 873 (1899) (citations omitted).

its case during an eight-day jury trial, but failed. The trial court recognized this truth after conducting the trial and it properly denied Thomas Hospital's motion for judgment as a matter of law.

Under any impartial analysis of the record, this Court should have affirmed that ruling. Instead, the majority suspends ordinary rules of law in its shameful decision to bestow unmerited victory to Thomas Hospital. Regrettably, the majority pays no heed to the appropriate role of this esteemed Court when it reverses a jury and trial court upon such lax standards.

I am authorized to state that Justice Davis joins me in this dissent.

Loughry, J., concurring, in part, and dissenting, in part:

I concur in the majority's conclusion that the respondent's defamation claim must be reversed due to the governing one-year statute of limitations and that the Wage Payment Act claim must be remanded for a new trial because of the trial court's prejudicial conduct during trial. I likewise concur that both the respondent's *Harless* [1] and intentional infliction of emotional distress claims must be reversed, but firmly disagree with the analysis employed by the majority regarding those claims. With its conclusion that these claims fail based on insufficiency of the evidence, the majority improperly invaded the fact-finding function of the jury. The respondent's *Harless* claim fails on a more fundamental basis and, therefore, should never have reached the jury. Because the respondent failed to articulate a substantial public policy that her discharge contravened, the *Harless* claim must fail. Moreover, because the evidence in support of the respondent's intentional infliction of emotional distress claim was duplicative of her retaliatory discharge evidence, she failed to articulate a separately recoverable claim. Accordingly, I respectfully concur, in part, and dissent, in part.

In *Harless*, this court held that the at-will employment doctrine was subject to exception where a discharge was effected in contravention of a substantial public policy:

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

Syllabus, *Harless*, 162 W.Va. 116, 246 S.E.2d 270. In syllabus point two of *Birthisel v. Tri–Cities Health Servs. Corp.*, 188 W.Va. 371, 372, 424 S.E.2d 606, 607 (1992), we held that sources of substantial public policy sufficient to support a *Harless* claim may be found among "established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." However, such substantial public policy is not found in policies which are "too general to provide any specific guidance or is so vague that it is subject to different interpretations." *Birthisel*, 188 W.Va. at 377, 424 S.E.2d at 612. Critically "a *Harless*-based action requires more than simply raising the [spectre] of a potentially governing law." *Frohnapfel v. ArcelorMittal USA LLC*, 235 W.Va. 165, 170, 772 S.E.2d 350, 355 (2015).

In the instant case, the trial court instructed the jury on a handful of federal regulations which it summarily deemed "public policy." [2] The majority states that it "presume[s]

---

1. *Harless v. First Nat. Bank in Fairmont*, 162 W.Va. 116, 116, 246 S.E.2d 270, 271 (1978).

2. The trial court instructed the jury as follows:

1. Standard 42 CFR 482.23 (b): Public policy requires that there be adequate personnel available in each unit of a hospital to ensure that there is the immediate availability of a registered nurse for bedside care of any patient when needed.

2. Standard 42 CFR 482.24(c)(1): All orders must be authenticated based upon Federal and State law. All orders, including verbal orders, must be dated, timed and authenticated promptly by the ordering practitioner or another practitioner who is responsible for the care of the patient and authorized to write orders in accordance with State law.

3. Standard 42 CFR 482.43(a): The hospital must identify at an early stage of hospitalization all patients who are likely to suffer adverse health consequences upon discharge if there is no adequate discharge planning.

4. Standard 42 CFR 482.43 (d): The hospital must transfer or refer patients, along with the necessary medical information, to appropriate

that the circuit court correctly stated public policies[.]" Had the majority properly addressed this threshold issue, it would never have had to reach the evidentiary issue upon which it based its decision. Because I expressly disavow the notion of this Court substituting its assessment of the evidence presented, I am compelled to dissent to the majority's analysis of this issue.[3]

Upon closer analysis, one discovers that the source of these "public policy" regulations is the Center for Medicare and Medicaid Services' ("CMS") "Conditions of Participation for Hospitals." 42 Code of Federal Regulations § 482.1 specifically states that "[t]he provisions of this part serve as the basis of survey activities *for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid." Id.* (emphasis added). These regulations are conditions of participation in and reimbursement by Medicare and Medicaid. *See Neiberger v. Hawkins,* 208 F.R.D. 301,

310 (D. Colo. 2002) (finding that CMS regulations do not provide right of action or establish standard of care, but merely determine whether hospital qualifies for provider agreement).

With that understanding, the inescapable conclusion is that these regulations do not meet our test for a *Harless*-based discharge. First, these regulations are not statements of the public policy of the State of West Virginia. Although they may be laudable in an aspirational sense and clearly constitute a best practice, apparently the respondent provided no such corollary requirements embraced and articulated by the State of West Virginia as a public policy. The substantial public policies with which this Court and our citizenry are concerned are those expressed and adopted by our elected officials, who representatively reflect the electorate. One need go no further than the nightly news to identify both federal and state regulations

---

facilities, agencies or outpatients services, as needed, for follow-up or ancillary care.

5. Standard 42 CFR 482.24(c)(2)(vii): All records must document the following as appropriate: Discharge Summary with outcome of hospitalization, disposition of care and provisions for follow up care.

6. Standard 42 CFR 482.21 (e) (2): Public policy requires that the hospital governing body, medical staff, and administrative officials are responsible and accountable for ensuring that the hospital-wide quality assessment and performance improvement efforts address priorities for improved quality of care and that improvement actions are evaluated.

**3.** I would be remiss if I did not likewise express my disagreement with the majority's misapprehension of the elements of proof required under *Harless. Harless* forbids a discharge which is in contravention of a substantial public policy. Nowhere in our jurisprudence is it required that the employer have committed the underlying acts that actually violated a substantial public policy. Simply put, if an employee complains about perceived violations of a substantial public policy and the employer discharges the employee for those complaints (i.e. in contravention of the substantial public policy), is it a requirement that the employee have actually been correct about whether the public policy was being violated by the employer? *Cf.* W.Va. Code § 6C–1–2 and 3 (2015) (prohibiting discrimination or retaliation of employee due to "good faith report" of wrongdoing; "good faith" report defined as report which employees need only have "reasonable cause to believe is true").

The majority seemingly concludes that the employee must prove that he or she was correct in their complaints. Our jurisprudence suggests otherwise and makes the focus of the claim on the *discharge* itself. *Harless* requires only that the *discharge* be "in contravention of" a public policy. Moreover, the four-factor test articulated in *Feliciano v. 7–Eleven, Inc.,* 210 W.Va. 740, 559 S.E.2d 713 (2001), states that an employee must prove that his or her dismissal *"jeopardize[s]"* the public policy at issue. *Id.* at 750, 559 S.E.2d at 723. (emphasis added). In spite of this, the majority bases its reversal of the *Harless* claim on the fact that the respondent "did not introduce any evidence showing Medicare fraud actually occurred" and "there was no evidence to say that the manner in which the hospital discharged patients violated Medicare guidelines." The majority conflates the distinct issues of whether the respondent's *discharge* was in contravention of public policy with the (potentially immaterial) issue of whether the underlying public policy itself was violated by the employer by making such statements as "[w]e are simply unable to find any evidence from which a jury could conclude that Thomas Memorial contravened some substantial public policy principle."

While I do not purport to pass on the issue of whether an employee must prove that complained-of actions on the part of the employer actually violated a substantial public policy, it is at a minimum clear that such an issue has not been previously addressed by this Court, nor does the majority address and directly resolve this concern. That "failure" suggests the majority's lack of appreciation for these critical distinctions.

and/or policies that do not necessarily reflect the values and policy considerations of the citizens of West Virginia. Thus, to blindly accept all existing regulations, federal and state, as statements of this state's public policy would impermissibly allow someone to bring suit who was fired in contravention of a policy to which our citizenry does not subscribe, or has expressly rejected. In my view, that is not the intended result of *Harless*.

Moreover, the primary regulation which the respondent urged—inadequate staffing—is relatively vague. 42 C.F.R. § 482.23(b) provides:

> The nursing service must have *adequate* numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate *availability* of a registered nurse for bedside care of any patient.

*Id.* (emphasis added). "Adequacy" and "availability" are fairly fluid concepts. What may be adequate on one day, with a certain patient load, may be inadequate on another day or even in an instant given the circumstances and expediencies of patient care. There is no concrete number or ratio provided in this policy and therefore is inherently subject to interpretation and constant adjustment to comply. This policy's shortcomings are a near-perfect description of the type of policy which this Court previously identified as "too general to provide any specific guidance or is so vague that it is subject to different interpretations" to constitute a "substantial public policy." *Birthisel*, 188 W.Va. at 377, 424 S.E.2d at 612.[4]

To be clear, there is no question that adequate staffing is of critical importance in our health care facilities. In fact, had the respondent identified a specific requirement regard-

ing staffing that provided an actual staffing-related standard, I would have little difficulty finding such to be a substantial public policy. As required by syllabus point three of *Birthisel*: "Inherent in the term 'substantial public policy' is the concept that the policy will provide *specific guidance* to a reasonable person." 188 W.Va. 371, 424 S.E.2d 606 (emphasis added).

Turning to the respondent's intentional infliction of emotional distress claim, I likewise agree that the jury award must be reversed. Unlike the majority, I find it unnecessary to wade into the factual morass to reach that conclusion because the respondent's claim again fails as a matter of law.

In *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 285, 445 S.E.2d 219, 226 (1994), *holding modified by Tudor v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), this Court stated:

> [T]he prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach.

Although the holding in *Dzinglski* stating that emotional distress damages are essentially duplicative of punitive damages was modified by *Tudor*, that modification does not affect the premise that an employee's proof must still be distinct on each claim. For instance, in *Tudor*, the plaintiff alleged that her employer, upon being called for references, continued to falsely and unfairly disparage her. As stated in *Dzinglski*, to sustain a commensurate intentional infliction of emotional distress claim concurrent with a discharge claim, an employee must point to some conduct *other than* the purportedly

---

4. The respondent argues that the Court's decision in *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997) is dispositive of this issue. In *Tudor*, this Court found a similarly-worded state regulation to create a substantial public policy. First, I note that the circuit court did not instruct the jury on any state regulations; rather, he cited a litany of federal regulations. Secondly, like the vague and subjective regulations cited herein, I believe that the state regulations at issue in *Tudor* were similarly too vague and non-specific to provide "specific guidance" of the level required to constitute a substantial public policy. *See Birthisel*, 188 W.Va. at 377, 424 S.E.2d at 612.

wrongful discharge to sustain such a claim. A review of the respondent's evidence demonstrates that, although emotionally distraught by a discharge she perceived to be unfair and unfounded, the respondent presented no evidence of improper conduct on her employer's part in effecting the discharge. In sum, her emotional distress was occasioned by the discharge itself, which was the basis of her retaliation claim. Intentional infliction of emotional distress is not an end-run around the required proof for a retaliatory discharge claim. Accordingly, under *Dzinglski*, the respondent's intentional infliction of emotional distress claim fails as a matter of law.

Finally, I write to emphasize my vehement rejection of the majority's intrusion into the jury's deliberations and its self-serving conclusion that the clearly conflicting evidence was simply insufficient to sustain the respondent's verdict. " 'It is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony is conflicting.' Point 3, Syllabus, *Long v. City of Weirton*, W.Va. (1975) [158 W.Va. 741] 214 S.E.2d 832." Syl. Pt. 2, *Bourne v. Mooney*, 163 W.Va. 144, 254 S.E.2d 819 (1979). My conclusion that the *Harless* and intentional infliction of emotional distress claims must be remanded is based upon an error of law that cannot be cured under any view of the evidence presented.

Accordingly, I respectfully concur, in part, and dissent, in part.